**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**FEB 25 2003**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

DONALD RAY CARTER,

Defendant - Appellant.

No. 02-5058
(D.C. No. 01-CR-116-C)
(N.D. Oklahoma)

---

**ORDER AND JUDGMENT**[*]

---

Before **TACHA**, Chief Judge, **ANDERSON** and **O'BRIEN**, Circuit Judges.

Donald Ray Carter pled guilty to one count of possessing a firearm and ammunition after a former felony conviction, in violation of 18 U.S.C. § 922(g), reserving his right to appeal the denial of his motion to suppress evidence obtained as a result of a traffic stop and a subsequent search of two residences. Pursuant to that reservation, he brought this appeal. We exercise jurisdiction pursuant to 28 U.S.C. § 1291 and AFFIRM.

---

[*]This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. This court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

## I. BACKGROUND

Carter was charged with a violation of 18 U.S.C. § 922(g)(1), Possession of a Firearm after Former Conviction of a Felony. He was also subject to the provisions of the Armed Career Criminal Act, 18 U.S.C. § 924(e). Carter filed a motion to suppress evidence obtained in searches of his person, his vehicle, and two residences. The search of the residences occurred after the issuance of search warrants. The district court denied Carter's motion to suppress, and on January 10, 2002, Carter entered a guilty plea under the condition that the ruling on the suppression motion could be appealed to this court. On April 25, 2002, Carter was sentenced to 192 months in prison, five years supervised release, a $5,000 fine, and a $100 special monetary assessment.

### A. *Traffic Stop*

The circumstances leading to the present appeal began when Officer Laurel Ledbetter – a narcotics officers with the Tulsa Police Department (TPD) – received information from a confidential informant that lead her to suspect that Carter was involved in the sale of cocaine. Based on the informant's information, Officer Ledbetter decided to conduct surveillance of the address provided by the informant.

While conducting surveillance on the evening of August 27, 2001, Officer Ledbetter observed Carter leave his residence, get into a silver Suburban bearing

the tag number provided by the informant, drive to the park, meet with another vehicle, and engage in what Officer Ledbetter believed to be a narcotics transaction. When Carter left the park, Officer Ledbetter lost sight of the silver Suburban and subsequently asked Officer Craig LaGrone – another TPD officer – to assist in stopping Carter's vehicle.

The traffic stop occurred later that day, when Officer LaGrone stopped Carter for a traffic violation. Officer LaGrone testified that he paced Carter's vehicle and determined that Carter was exceeding the posted speed limit by 10 miles per hour. After learning of the traffic stop, Officer Ledbetter proceeded to the location and arrived within 10 minutes of the stop. Officer Ledbetter was accompanied by Officer David Wamsley – a TPD K-9 handler– and Officer Wamsley's drug dog, Sid.

Officer LaGrone testified at the suppression hearing that he advised Carter that he had stopped him for speeding and asked for his driver's license, registration, and insurance verification. Officer LaGrone testified that Carter produced satisfactory evidence of his right to drive the vehicle, but he was unsure whether Carter produced a driver's license. According to Officer LaGrone, Carter was extraordinarily nervous, "his coordination was not the greatest," he "wasn't real coherent with his answers," and his speech was "slowed."

Because of his strange behavior, Officer LaGrone was concerned that

Carter was intoxicated. He asked Carter to exit the vehicle to get a better idea of why he was behaving abnormally. Officer LaGrone testified that, prior to performing any field sobriety tests, he patted down Carter's clothing, then asked him to consent to a more thorough search of his person. Officer LaGrone testified that Carter consented to this search. Carter disputes this fact. Officer LaGrone then removed the contents of Carter's pockets, which included six twenty-dollar bills. According to Officer Ledbetter, this is the going rate for an "eightball" (one eighth of an ounce) of crack cocaine.

Upon determining that Carter did not have the signs of alcohol intoxication, Officer LaGrone remained concerned about Carter's abnormal behavior. He asked Officer Ledbetter to conduct tests to determine whether Carter was under the influence of any drugs. Officer Ledbetter performed three separate tests for drug intoxication, then reported to Officer LaGrone that Carter was not under the influence of intoxicating drugs. Officer LaGrone then continued the process of issuing a traffic citation.

While the officers were conducting the field sobriety tests, the canine unit prepared to conduct a "sniff" of the vehicle. Prior to the issuance of the citation, the drug dog indicated the presence of drugs in the vehicle. After the K-9 unit alerted on both the outside and the inside of the vehicle, officers conducted a hand search. Officer Ledbetter testified that a small quantity of what field-tested

to be cocaine was located on the driver's seat of the vehicle.

There was some dispute at the suppression hearing as to the time lapse between the initial stop and the point at which the drug dog alerted to the presence of drugs. The district court concluded that approximately 25 minutes elapsed from the initial stop to the dog's alert. The district court ruled that this time period was not an unreasonable delay, stating that the police officers should be "congratulated" for their efforts to determine if Carter was intoxicated. The district court denied the defendant's motion to suppress.

B. *Search of the Residences*

1. *North Main Street Affidavit*

Officer Ledbetter sought a search warrant for Carter's residence at 1539 North Main Street. In the affidavit for the search warrant, Officer Ledbetter reported information previously provided by a confidential informant. According to the affidavit, the confidential informant told Officer Ledbetter that a person known to the informant as "Bo Money" was selling drugs from his vehicle. The informant provided the officer with a description of "Bo Money," the vehicle he would be driving, and the tag number of that vehicle. The informant also told Officer Ledbetter that "Bo Money" resided at 1539 North Main Street and stored large sums of currency and drugs at his residence.

In addition to the information from the confidential informant, Officer

Ledbetter included information about the transaction in the park and the traffic stop resulting in the discovery of money on Carter's person and drugs in Carter's vehicle. Lastly, she noted that Carter had used the name "Bo Money" in the past. Based upon this information, a search warrant was issued for Carter's residence at 1539 North Main Street. The search resulted in the discovery of a small quantity of cocaine and six firearms.

2.     *Cheyenne Avenue Affidavit*

After conducting a search at 1539 North Main Street, Officer Ledbetter sought a search warrant for another location connected with Carter. The affidavit in support of the search warrant for the Cheyenne Avenue location is less extensive, merely requesting a warrant to search another residence for large quantities of drugs. The affidavit states that the search of the North Main Street address produced an electric bill listing the Cheyenne address and showing Elizabeth Kaye Carter as the holder of electric service. It notes that (1) Officer Ledbetter had driven by the residence and noted that it had barred doors and windows, which drug dealers often use to protect drugs and/or money, (2) one of Carter's vehicles was parked in front of the residence, (3) a small quantity of cocaine was found at the North Main Street residence, and (4) individuals who engage in the sale of illegal substances often keep their drugs at a secondary location. Based upon this information, a search warrant was issued for the

Cheyenne Avenue location. At this location, the officers found drug residue, drug paraphernalia, and another firearm.

## II. DISCUSSION

Carter alleges that the district court erred in denying his motion to suppress for the following reasons. First, the search warrants were tainted because they were based on information derived from an unconstitutional search of Carter's person and his vehicle. Second, the search warrants were not supported by probable cause. Third, the good-faith exception announced in <u>United States v. Leon</u>, 468 U.S. 897 (1984), does not apply.

### A. Standard of Review

In reviewing Carter's Fourth Amendment suppression claim, we will uphold the factual findings of the trial court unless they are clearly erroneous. <u>United States v. Smith</u>, 63 F.3d 956, 960 (10th Cir. 1995) (citation omitted). We view the evidence in the light most favorable to the district court's ruling. <u>Id</u>. In determining whether probable cause supported a search warrant, we give considerable deference to the initial determination, unless the affidavit provides no substantial basis for probable cause. <u>Id</u>. (citation omitted). The ultimate question whether Fourth Amendment rights have been violated is an issue of law, which we review de novo. <u>Id</u>. (citation omitted).

### B. Whether the Search of Carter's Person and Vehicle Was Proper

A routine traffic stop is a seizure within the meaning of the Fourth Amendment, United States v. Anderson, 106 F.2d 942, 945 (10th Cir. 1997), although it is characterized as an investigative detention rather than a custodial arrest, Berkemer v. McCarty, 468 U.S. 420, 437-39 (1984). We consider the reasonableness of an investigative detention under the principles announced in Terry v. Ohio, 392 U.S. 1, 19-20 (1968).

To determine whether a traffic stop violates the Fourth Amendment, we must determine whether the stop was based on an observed traffic violation or reasonable, articulable suspicion that a traffic or equipment violation has occurred or is occurring. United States v. Botero-Ospina, 71 F.3d 783, 787 (10th Cir. 1995). It is not relevant to our Fourth Amendment review that the officer may have had other subjective motives for stopping the vehicle. Id. The sole inquiry is whether the officer had reasonable suspicion that the particular motorist violated any one of the numerous applicable traffic or equipment regulations. Id. In this case, Officer LaGrone personally observed Carter operate a vehicle while speeding. Thus, the initial stop was proper.

Having determined that the officer's initial stop was proper, we must now determine whether the officer's actions exceeded the scope of the initial stop, which was for a speeding violation. Detention beyond the purpose of the original stop is permissible in only two instances: (1) when the officer, during the course

- 8 -

of the stop, develops "an objectively reasonable and articulable suspicion" that the driver is breaking the law; or (2) when the driver consents to additional questioning. United States v. Elliot, 107 F.3d 810, 813 (10th Cir. 1997). If we determine that the officers' actions exceeded the scope of the stop, then we must determine whether one of the two above mentioned exceptions apply.

Carter alleges that Officer LaGrone exceeded the scope of the stop in two ways: first, by conducting the field sobriety tests; and second, by asking Carter additional questions after completing the field sobriety tests. As to the first contention, while we agree that these tests exceeded the scope of the initial stop, we disagree with Carter's suggestion that Officer LaGrone was acting without reasonable suspicion. According to Officer LaGrone, Carter was extraordinarily nervous; "his coordination was not the greatest;" he "wasn't real coherent with his answers;" and his speech was "slowed." Based on this information, Officer LaGrone had a reasonable and articulable suspicion that Carter was under the influence of alcohol or drugs. Thus, Officer LaGrone was justified in going beyond the scope of the initial stop to determine whether Carter was under the influence of alcohol or illegal drugs. The record indicates that after determining Carter was not under the influence of alcohol, Officer LaGrone was still concerned about Carter's abnormal behavior. He asked Officer Ledbetter – who was already present at the scene – to conduct tests to determine if Carter was

under the influence of any drugs. This, too, was justified by Officer LaGrone's continuing suspicion that Carter was under the influence of an illegal substance.

Carter next alleges that Officer LaGrone exceeded the scope of the initial stop by subjecting Carter to additional questions after the conclusion of the field sobriety tests. An officer may pose questions to vehicle passengers during a routine traffic stop to determine whether they have lawful possession of the vehicle. United States v. Alvarez, 68 F.3d 1242, 1244-45 (10th Cir. 1995). In addition, an officer may question the occupants of a vehicle concerning their travel plans. United States v. Kopp, 45 F.3d 1450, 1453-54 (10th Cir. 1995). Thus, Officer LaGrone's questions regarding Carter's travel plans were within the legitimate scope of the initial stop.

Once it was determined that Carter was not under the influence of alcohol or drugs, Officer LaGrone resumed the process of issuing the speeding citation. It was at this point that the drug dog alerted to the presence of drugs. Having determined that the drug dog alerted to the presence of drugs during a valid investigative detention, we turn next to the validity of the drug dog's presence.

We have previously held that a dog sniff, under circumstances such as these, is not a "search" within the meaning of the Fourth Amendment; an individualized reasonable suspicion of drug-related activity is therefore not required when the dog sniff is employed during a lawful seizure of the vehicle.

United States v. Morales-Zamora, 914 F.2d 200, 203 (10th Cir. 1990); see also

United States v. Place, 462 U.S. 696, 707 (1983) (exposure of defendant's

luggage, located in public place, to canine sniff is not a "search" within the

meaning of the Fourth Amendment).  Thus, the dog sniff in this case was not a

search.  Once the dog indicated the presence of drugs in the vehicle, the officers

had probable cause to search the interior of the vehicle.  See United States v.

Ludwig, 10 F.3d 1523, 1527-28 (10th Cir. 1993); Morales-Zamora, 914 F.2d at

205.  Therefore, the district court correctly refused to suppress the evidence of

drugs found in the vehicle.

Regarding the money found in Carter's pockets, Officer Ledbetter stated

that Carter consented to this search; Carter denies consenting to this search.  The

district court denied Carter's motion to suppress the money.  We must view the

evidence in the light most favorable to the ruling below and uphold the district

court's findings unless they are clearly erroneous.  Smith, 63 F.3d at 960.

Viewing the evidence in the light most favorable to the ruling below, we

hold that the district court properly denied Carter's motion to suppress the

evidence obtained as a result of the traffic stop.

C.     Whether the Search Warrants Contain Sufficient Probable Cause

The Fourth Amendment requires that "no warrant shall issue, but upon

probable cause, supported by oath or affirmation, and particularly describing the

place to be searched and the persons or things to be seized." U.S. CONST. AMEND IV. We recognize that "probable cause is a fluid concept – turning on the assessment of probabilities in particular factual contexts – not readily, or even usefully, reduced to a neat set of legal rules." United States v. Soussi, 29 F.3d 565, 568 (10th Cir. 1994) (quoting Illinois v. Gates, 462 U.S. 213, 232 (1983). An issuing magistrate is to make a practical, common-sense decision whether, given the totality of the circumstances set forth in the affidavit, there is a fair probability that a search will reveal contraband or evidence of a crime in a particular place. Id.

A reviewing court owes great deference to a magistrate's determination of probable cause and should uphold that conclusion when "the totality of the information contained in the affidavit provided a substantial basis for finding there was a fair probability that evidence of criminal activity would be found . . . ." Id. at 568-69. An affiant's experience and expertise may be considered by an issuing magistrate as well. Id. An affidavit in support of a search warrant must contain facts sufficient to lead a prudent person to believe that a search would uncover contraband or evidence of criminal activity. United States v. Danhauer, 229 F.3d 1002, 1006 (10th Cir. 2000). The affidavits in this case provided facts sufficient to establish probable cause.

The North Main Street affidavit contains statements made by a confidential

informant indicating that a person known as "Bo Money" sold drugs from his vehicle. The affidavit also corroborated the informant's information. Officer Ledbetter confirmed that Carter resided at the location provided by the informant, that Carter drove the type of vehicle described by the informant, and that Carter had used the name "Bo Money" in the past. In addition, Officer Ledbetter described the transaction in the park between Carter and an unknown male, which she believed was a drug transaction. Finally, Officer Ledbetter included information about the drugs found in Carter's vehicle and the $120 – the price of an eightball of cocaine – found in Carter's pocket. Officer Ledbetter concluded by stating that, in her experience, when individuals transport and sell illegal drugs from their vehicles there will often be residue of the substance in the vehicle – as was the case here.

The second affidavit – for the Cheyenne Avenue location – refers to the confidential informant who provided information for the first search warrant. It then refers to the recoveries made at 1539 North Main, including firearms, controlled substances, drug paraphernalia, and documentation connecting Carter to the residence at 4657 North Cheyenne. These recoveries provided further independent corroboration of the information provided by the confidential informant. The affidavit also notes that, in Officer Ledbetter's experience, individuals who sell drugs often keep most of their drugs in a stash house.

Carter alleges that the affidavits were deficient because Officer Ledbetter failed to establish the informant's reliability and basis of knowledge. "When there is sufficient independent corroboration of an informant's information," however, "there is no need to establish the veracity of the informant." Danhauer, 229 F.3d at 1006. Although Officer Ledbetter did not establish the veracity of the informant, she did provide independent corroboration of the informant's information. This corroboration included Officer Ledbetter's verification of Carter's physical characteristics, a description of his vehicle, and the fact that Carter resided at the residence reported by the informant. Corroboration of these innocent details is not sufficient to establish probable cause. However, Officer Ledbetter provided further corroboration: the transaction in the park between Carter and the unknown male; the fact that Carter used the name "Bo Money" in the past; the money found in Carter's pocket; and the cocaine found in Carter's vehicle. This information, viewed as a whole, constitutes more than mere corroboration of innocent details. Giving the required deference to the magistrate judge's determination, this information supported issuance of search warrants for the locations specified in the warrants.

Because we affirm the district court's finding that the warrants were supported by probable cause, we need not address the good-faith exception announced in Leon.

III.   CONCLUSION

For the foregoing reasons, we AFFIRM the district court's denial of Carter's motion to suppress.

ENTERED FOR THE COURT,


Deanell Reece Tacha
Chief Circuit Judge